UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 09-21749-CIV-GOLD/MCALILEY

THE POOLE AND KENT COMPANY,

    Plaintiff,

v.

TETRA TECH, INC., *et al.*,

    Defendants.

and all consolidated and related third-party actions.

_____/

<u>ORDER DENYING TETRA TECH'S MOTION FOR SUMMARY
JUDGMENT AS TO COUNT II **[DE 95]**; DENYING WILLIAM McCONNELL'S
MOTION FOR SUMMARY JUDGMENT AS TO COUNT VI **[DE 134]**</u>

**I.     Introduction**

THIS CAUSE is before the Court on Defendants Tetra Tech and Hartman Associates, Inc.'s Motion for Summary Judgment as to Count II **[DE 95]**, and Defendant William McConnell's Motion for Summary Judgment as to Count VI **[DE 134]**. Oral argument on the Motions was held on August 13, 2010. Having thoroughly reviewed the pleadings filed by the parties, the applicable law, and the summary judgment record, I conclude that the evidence offered is insufficient to support summary judgment in favor of Defendants. Plaintiff Poole and Kent Company ("Poole and Kent") blames the dearth of evidence on the fact that many witnesses had yet to be deposed and various expert reports had not been produced at the time the Motions were filed. Thus, Poole and Kent complains that the Motions are at best premature. I agree.

As stated at the oral argument held on July 26, 2010, it is clear from the briefs and

1

the record evidence that the parties have failed to sufficiently flesh out the theories of the case and pursue supporting evidence through discovery. For example, the parties have failed to satisfactorily develop the relationship between Tetra Tech, the City of North Miami Beach ("the City"), and Poole and Kent pursuant to the pertinent agreements. Moreover, neither party has fully explicated Florida law on the relevant issues. Although Defendants seek a continuance under Fed. R. Civ. P. 56(f) on the grounds that the Motions are premature, I decline to grant a continuance. Instead, I take this opportunity to elaborate on applicable Florida law and address factual issues that have yet to be resolved.[1]

I. **Background**[2]

This case concerns a dispute over the design and construction of the Norwood-Oeffler Water Treatment Plant (the "Project"). The Owner of the Project is the City, who contracted with Hartman & Associates, Inc., later known as Tetra Tech, Inc. (collectively "Tetra Tech"), to serve as engineer.[3] Throughout the course of project construction, Tetra

---

[1] Given that the instant record is deficient, I need not reach the merits of Tetra Tech's Motions to Strike the Declarations of Patrick H. Carr and Brian McCluggage [DE 148, 149]. Accordingly, I deny them without prejudice.

[2] Tetra Tech does not refute the allegations of Poole and Kent's Amended Complaint based on a misunderstanding of Florida law. [DE 97, p. 7 n. 1 ("Although the truth of the [Amended Complaint's] allegations is in dispute, for purposes of summary judgment, the facts as plead are to be taken as true.")]. This is because, as explained in more detail below, Tetra Tech's argument on summary judgment is predicated on the erroneous premise that if Tetra Tech is not a stranger to the Contract between Poole and Kent and the City as a matter of law, Tetra Tech's privilege to interfere in the contractual relationship is absolute. Accordingly, it is Tetra Tech's mistaken position that, even taking the allegations of Plaintiff's Amended Complaint as true, all of the actions complained of are within the scope of Tetra Tech's duties under the contract at issue, thereby shielding Tetra Tech from liability for tortious interference.

[3] In August 2002, Tetra Tech entered into a Professional Services Agreement with the City ("2002 Agreement"). [DE 97, p. 1]. Although the 2002 Agreement is part of the record, neither party

Tech provided architectural and engineering design services; permitting services;[4] administrative services related to the contract bidding process; and construction management services. Moreover, Defendant William McConnell ("McConnell") of Vertex Construction Services, Inc., a wholly owned subsidiary of Tetra Tech, provided certain services as part of the Tetra Tech team.[5]

In 2004, after a competitive bidding process, Poole and Kent entered into a contract with the City. The agreement between the City and Poole and Kent was comprised of contract documents, which contained, among other things, an eight page "Agreement," the Standard General Conditions of the Construction Contract, and the Supplementary Conditions (collectively "the Contract"). The Contract states in pertinent part:

ARTICLE 9 – ENGINEER'S STATUS DURING CONSTRUCTION

9.01 OWNER'S Representative

A. ENGINEER will be OWNER's representative during the construction period.

---

described its effective date, terms, and scope. More specifically, both parties failed to address Tetra Tech's duties and obligations under the 2002 Agreement, and what impact, if any, such duties and obligations have on the issues raises in Tetra Tech's Motion for Summary Judgment [DE 95].

[4] The Project was subject to permitting by various regulatory agencies, including the Miami-Dade County Building Department, the Miami-Dade County Department of Environmental Resources Management, the Miami-Dade Water and Sewer Department, the Miami-Dade Fire Marshal, and various other permitting authorities. [DE 45, p. 4]. In the fall of 2004, permitting for the Project was transferred from the Miami-Dade County Building Department to the City of Miami Gardens Building Department. *Id.*

[5] As explained below, McConnell's precise role in connection with the Project is unclear from the record. While McConnell contends that he acted as a claims consultant on the Project and provided negotiation services, Poole and Kent claims that McConnell was the "Executive" in charge of administering design and construction management for the Project on behalf of Tetra Tech. [DE 136; DE 164].

3

The duties and responsibilities and limitations of authority of ENGINEER as OWNER's representative during construction are set forth in the Contract Documents and will not be changed without written consent of OWNER and ENGINEER.

* * *

9.05 Authorized Variations in Work

A. ENGINEER may authorize minor variations in the Work from the requirements of the Contract Documents which do not involve an adjustment in the Contract Price or the Contract Times and are compatible with the design concept of the completed Project as a functioning whole as indicated by the Contract Documents. These may be accomplished by a Field Order and will be binding on the OWNER and also on CONTRACTOR, who shall perform the Work involved promptly. . . . .

9.06 Rejecting Defective Work

A. ENGINEER will have authority to disapprove or reject Work which ENGINEER believes to be defective, or that ENGINEER believes will not produce a completed Project that conforms to the Contract Documents or that will prejudice the integrity of the design concept of the completed Project as a functioning whole as indicated by the Contract Documents. ENGINEER will also have authority to require special inspection or testing of the Work as provided in paragraph 13.04, whether or not the Work is fabricated, installed, or completed.

* * *

9.09 Decisions on Requirements of Contract Documents and Acceptability of Work

A. ENGINEER will be the initial interpreter of the requirements of the Contract Documents and judge of the acceptability of the Work thereunder. Claims, disputes and other matters relating to the acceptability of the Work, the quantities and classifications of Unit Price Work, the interpretation of the requirements of the Contract Document pertaining to the performance of the Work, and Claims seeking changes in the Contract Price or Contract Times will be referred initially to ENGINEER in writing, in accordance with the provisions of paragraph 10.5, with a request for a formal decision.

B. When functioning as an interpreter and judge under this paragraph 9.09, ENGINEER will not show partiality to OWNER or CONTRACTOR and will not be liable in connection with any interpretation or decision rendered in good faith in such capacity. The rendering of a decision by ENGINEER pursuant to this paragraph 9.09 with respect to any such Claim, dispute, or other

> matter . . . will be a condition precedent to any exercise by OWNER or CONTRACTOR of such rights or remedies as either may otherwise have under the Contract Documents or by Laws or Regulations in respect of any such Claim, dispute, or other matter.
>
> 9.10 Limitations on ENGINEER's Authority and Responsibilities
>
> B. Neither ENGINEER's authority or responsibility under this Article 9 or under any other provision of the Contract Documents nor any decision made by ENGINEER in *good faith* either to exercise or not exercise such authority or responsibility or the undertaking, exercise, or performance of any authority or responsibility by ENGINEER shall create, impose, or give rise to any duty in contract, tort, or otherwise owed by ENGINEER to CONTRACTOR, any Subcontractor, any Supply, any other individual or entity, or to any surety for or employee or agent of any of them.

[DE 123-2] (emphasis added). The parties do not dispute that Tetra Tech is not a signatory to the Contract between Poole and Kent and the City. [DE 95, p. 6].

In July 2004, the City issued the Notice to Proceed with Project construction based on Tetra Tech's recommendation. [DE 45, p. 8]. Pursuant to the Contract, the Project was to be finalized within 790 days of the issuance of the Notice to Proceed, or September 24, 2006. [DE 97, p. 2]. However, the building permits required for Poole and Kent to begin full-scale construction of the Project were not obtained by Tetra Tech until March 7, 2005.[6] [DE 45, p. 9]. Moreover, the construction drawings that incorporated the various building code and regulatory requirements necessary for Project construction were not furnished by Tetra Tech to Poole and Kent until June 2005. [DE 45, p. 17].

On February 2, 2005, a Project meeting was held which was attended by Poole and Kent Executive Vice President, Patrick Carr; the City's Public Services Director; the

---

[6] Although it is unclear from the record, it appears the various permits were obtained subsequent to March 7, 2005. [DE 45, p. 9].

Assistant Public Services Director for the City; and James Christopher ("Christopher"), Tetra Tech's Vice President. [DE 124, p. 4]. During the meeting, Christopher stated that the permitting process for the Project was delayed due to a change in permitting jurisdiction from Miami-Dade County to the City of Miami Gardens. (*Id.*). According to Poole and Kent, however, the delay in obtaining the required permits was not caused by the transfer of permitting responsibility, but instead by Tetra Tech since the original design drawings were rejected by permitting authorities due to design deficiencies in Tetra Tech's technical documents. [*Id.*; DE 45, p. 43-4]. In March 2005, Poole and Kent submitted a partial Request for an Equitable Adjustment to Tetra Tech in the amount of $1,545,793.00 for the delay in securing the building permits required for Poole and Kent to commence full-scale construction. [DE 125, p. 2].

In March 2006, Tetra Tech, on behalf of the City, and Poole and Kent negotiated and agreed to a change order, issued as "Change Order No. 3." [DE 124, p. 4]. Change Order No. 3 settled all adjustments due from the City in contract time and associated delay damages that occurred prior to February 21, 2006, and also called for a substantial reduction in the amount of additional contract time and monetary compensation that Poole and Kent would receive as a result of the permitting delays. [DE 45, p. 49]. Tetra Tech's February 2, 2005 statement that the delay was caused primarily by a change in permitting jurisdiction was stated as the "Justification" in Change Order No. 3 when it was executed in April 2006.[7] [DE 125-2, p. 3].

---

[7] According to Poole and Kent, during the negotiations related to Change Order No. 3, Tetra Tech made other false representations, including a false statement that the relocation of the "meter vault" and its new configuration was not a "critical activity" and therefore was not

6

Poole and Kent alleges additional examples of improper conduct on the part of Tetra Tech throughout the course of the Project. For instance, Poole and Kent contends that Tetra Tech threatened to take back from Poole and Kent the $700,000.00 that it was ultimately paid by the City in connection with Change Order No. 3. [DE 125-1, p. 3]. Poole and Kent also points to evidence of record indicating that in August 2006, Tetra Tech employee Bill Peterson ("Peterson") told Brian MacClugage ("MacClugage") of Poole and Kent that Peterson's superiors at Tetra Tech, including Christopher, had instructed him to be "overzealous" with inspecting Myers Construction Group's work on the Project. [DE 126-1]. Moreover, Poole and Kent cites evidence purporting to demonstrate that Tetra Tech refused to pay Poole and Kent a portion of its retainage fee when instructed to do so by the City. [DE 123-7].

Poole and Kent has filed a six-count Amended Complaint. Tetra Tech moves for summary judgment in its favor as to Count II, tortious interference, arguing that because it is not a stranger to the Contract, Tetra Tech cannot be liable for tortious interference as a matter of law. McConnell moves for summary judgment as to Count VI, professional negligence, arguing that because he did not render professional services on the project, he did not owe a duty to Poole and Kent to exercise due care in performing professional services.

## II.  Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when the pleadings and supporting materials show that there is no genuine issue as to any

---

compensable in connection with Change Order No. 3. [DE 45, p. 47].

material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it hinges on the substantive law at issue and it might affect the outcome of the nonmoving party's claim. *See id.* ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252; *Bishop v. Birmingham Police Dep't*, 361 F.3d 607, 609 (11th Cir. 2004).

The moving party bears the initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact. *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997). Once the moving party satisfies this burden, the burden shifts to the party opposing the motion to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett,* 477 U.S. 317, 324 (1986). A factual dispute is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party. *Anderson,* 477 U.S. at 248; *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001). In assessing whether the movant has met its burden, the court should view the evidence in the light most favorable to the party opposing the motion and should resolve all reasonable doubts about the facts in favor of the non-moving party.[8] *Denney,* 247 F.3d at 1181.

---

[8]

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332. Because this is a diversity case, the parties agree that Florida's substantive law governs. Under Florida law, I "must follow the decisions of the state's highest court, and in the absence of such decisions on an issue, must

8

### III. Discussion

A.     Count II - Tortious Interference

Count II of the Amended Complaint alleges that Tetra Tech tortiously interfered with Poole and Kent's contract with the City. Florida law sets forth four elements for a claim of tortious interference with a contract or business relationship. Poole and Kent must prove: (1) the existence of a contract or business relationship between Poole and Kent and the City; (2) Tetra Tech's knowledge of a contract or a business relationship; (3) that Tetra Tech intentionally and unjustifiably interfered with that relationship and (4) that Poole and Kent suffered damages as a result.[9] *KMS Restaurant Corp. V. Wendy's International, Inc.*, 361 F.3d 1321, 1325 (11th Cir. 2005) (citing *Seminole Tribe v. Times Pub. Co.*, 780 So.2d 310, 315 (Fla. 4th DCA)). In the instant case, the first two elements are not in dispute. Instead, Tetra Tech focuses on the third element, arguing that, as a matter of law, an interference with contractual relations cannot be an unjustified if the interfering party is also

---

adhere to the decisions of the state's intermediate appellate courts unless there is some persuasive indication that the state's highest court would decide the issue otherwise." *Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 945 (11th Cir. 1982) (citations omitted).

[9] The parties agree that tortious interference with a contractual relationship and with a business relationship are essentially the same cause of action under Florida law and differ only to the extent that in the former cause of action the business relationship is evidenced by a contract. *Smith v. Ocean State Bank*, 335 So.2d 641, 642 (1st DCA 1976) ("[T]ortious interference with a contract and tortious interference with a business relationship are basically the same cause of action. The only material difference appears to be that in one there is a contract and in the other there is only a business relationship."). Moreover, as the two torts are similar to the extent that they both require a showing of improper conduct to defeat a justification defense, I draw from cases addressing both torts to inform the improper conduct inquiry. *See, e.g., KMS Restaurant Corp., Inc.*, 361 F.3d 1325-27.

9

a party to the contract.[10]

"In general it is true, under Florida law, that a cause of action for tortious interference cannot exist against one who is himself a party to the contract." *Burger King Corp. v. Ashland Equities, Inc. et. al.*, 161 F.Supp.2d 1331, 1336 (S.D. Fla. 2001) (internal quotations and citations omitted); *see also W.D. Sales and Brokerage LLC v. Barnhill's Buffet of Tenn., Inc.*, 362 Fed. App'x. 142 (11th Cir. 2010) ("For the interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship."); *Genet Co. v. Annheuser-Busch, Inc.*, 498 So.2d 683, 684 (Fla. 3d DCA1986). "[T]he law protects parties who are in privity of contract from exposure to liability for actions based upon theories of tortious interference with contractual relations by granting them a 'privilege to interfere.' "[11] *Ashland Equities, Inc.*, 161 F. Supp. 2d at 1336. However, as Florida's First District Court of Appeal explained in *O.E. Smith's Sons, Inc., v. Steve George*, 545 So. 2d 298, 299 (1st DCA 1989), "the privileged interference enjoyed by a party that is integral to a business relationship is not absolute." *Id.* (*citing Sloan v. Sax*, 505 So.2d 526 (Fla. 3d DCA 1987)); *see also H. Salit v. Ruden, McClosky, Smith, Shcuster & Russell, P.A.*, 742 So. 2d 381, 386 (Fla. 4th DCA 1999).

---

[10] In other words, Tetra Tech argues that "having justification or privilege to interfere with a contract is an affirmative defense to a tortious interference action." [DE 95, p. 5]; *see also Special Purpose Accounts Receivable Co-op Corp. v. Prime One Capital Co.*, 125 F. Supp.2d 1093, 1104 (S.D. Fla.2000) (noting that justification or privilege to interfere with a contract is an affirmative defense to a tortious interference action).

[11] While Tetra Tech moves for summary judgment asserting a "justification or privilege defense," in its Reply brief Tetra Tech states repeatedly that it has not raised a "qualified privilege defense." This is yet another reflection of Tetra Tech's misunderstanding of the law and is pure semantics. Florida courts often refer to a party's right to interfere as a "privilege" to interfere.

Indeed, the privilege to interfere "carries with it the obligation to employ means that are not improper." *Making Ends Meet, Inc. v. Cusick*, 719 So.2d 926 (Fla. 3d DCA 1998) (citing *McCurdy v. Collis*, 508 So.2d 380, 384 (Fla. 1st DCA 1987)). "The right to interfere in contractual relations, as granted to interested parties, is qualified by the obligation to proceed in good faith. This good faith requirement, common to all facets of contract law, disqualifies litigants from asserting the privilege when they have acted with malicious or conspiratorial motives." *Ashland Equities, Inc.*, 161 F. Supp. 2d at 1336 (citing *Morsani v. Major League Baseball*, 663 So.2d 653, 657 (Fla. 2d DCA 1995)). For that reason, "the privilege does not encompass the purposeful causing of a breach of contract."[12] *Making Ends Meet*, 719 So.2d at 926 (citing *McCurdy*, 508 So.2d at 384); *see also Morsani*, 663 So.2d at 657 (recognizing the privilege to interfere as a valid defense to a claim for tortious interference so long as the interference was not done for some improper purpose).

Tetra Tech relies on *Palm Beach County Health Care District v. Professional Medical Education, Inc.*, 13 So. 3d 1090 (Fla. 4th DCA 2009) ("*PME*"), as authority for the argument that it is not a stranger to the Contract and is therefore not liable for tortious interference as a matter of law. In that case, the court held that "[a] defendant is not a stranger to a business relationship, and thus cannot be held liable for tortious interference, when it has a supervisory interest in how the relationship is conducted or a potential financial interest in how a contract is performed." *Id.* at 1094. Crucial to the court's holding

---

[12] I note that in *KMS Restaurant Corp. v. Wendy's International, Inc.*, 361 F.3d 1321 (11th Cir. 2004), the Eleventh Circuit clarified that "Florida decisions [] support [the] contention that even where the defendant's motive is not purely malicious, a tortious interference claim may succeed if improper methods were used." *Id.* (*citing Ethyl*, 386 So.2d at 1225-26).

in *PME* that the interfering party was an "interested third party" and therefore not a stranger to the contractual relationship, was the fact that the interfering party was the source of the business opportunity with which it allegedly interfered with. *Id.* (holding that an interfering party is not a "stranger" to any contract that it ultimately will fund). Unlike in *PME*, it is clear from the instant record that the City was the source of the contractual relationship, as opposed to Tetra Tech, the alleged interfering party. Thus, Tetra Tech's reliance on *PME* is misplaced. Moreover, as set forth above, given that the parties have failed to fully develop the relationship between Tetra Tech, the City, and Poole and Kent pursuant to the pertinent agreements, the evidence offered here is insufficient to support a finding that Tetra Tech was a "party" to the Contract as a matter of law.

Even if Tetra Tech were able to demonstrate that it was a "party" to the Contract as a matter of law, genuine issues of fact remain as to whether Tetra Tech employed improper means to interfere with the Contract between Poole and Kent and the City. Poole and Kent argues that Tetra Tech intentionally and unreasonably interfered with Poole and Kent's work on the Project. More specifically, Poole and Kent points to evidence indicating that Tetra Tech acted in bad faith by intentionally making false statements throughout project construction, including Tetra Tech's February 2, 2005 statement. *See Slip-N-Slide Records, Inc. v. TVT Records, LLC*, 2007 WL 473273, *4 (S.D. Fla. February 8, 2007) ("Fraudulent misrepresentations are ordinarily a wrongful means of interference and make interference improper."). Poole and Kent further points to evidence supporting the inference that Tetra Tech unjustifiably threatened to take back the $700,000.00 that Poole and Kent was ultimately paid by the City in connection with Change Order No. 3, and that

12

Tetra Tech refused to pay Poole and Kent a portion of its retainage fee when instructed to do so by the City. "When there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question." *International Sales & Service, Inc. v. Austral Insulated Products*, *Inc.*, 262 F.3d 1152, 1060 (11th Cir. 2001) (citing *Manufacturing Research Corp. v. Greenlee Tool Co.,* 693 F.2d 1037, 1040 (11th Cir. 1982)) (internal quotations omitted). Thus, genuine issues of fact remain as to whether Tetra Tech acted for an improper purpose, thereby exceeding the bounds of the privilege to interfere.

Alternatively, Tetra Tech directs us to case law outside Florida – in particular, *BECO Construction Company, Inc. v. J-U-B Engineers, Inc.*, 184 P.3d 844 (Idaho 2008) – for the contention that it was privileged to interfere with the Contract based on agency principles. In that case, a general contractor for a city development project filed a lawsuit against the project's engineer, claiming that the engineer intentionally interfered with its construction contract with the city. *Id.* The court held that since the engineer was an agent of the city, and was acting for the benefit of the city, the engineer was not a stranger to the contract between the general contractor and the city and therefore could not be liable for tortious interference. *Id*. at 850. Citing *BECO*, Tetra Tech argues that since it has rights and obligations under the Contract and served as the City's agent, it is a "party" to the contract. In response, Poole and Kent points to a provision of the 2002 Agreement between Tetra Tech and the City which states that "[Tetra Tech] and its employees and agents shall be deemed to be independent contractors, and not agents or employees of

13

the City." [DE 123, Ex. 1]. Under Florida law, agency status is a question of fact, except in those cases where the party opposing summary judgment is unable to point to any conflicting facts or inferences to be drawn from those facts. *See M.S. Nova Southeaster Univ. Inc.*, 881 So. 2d 614, 617 (Fla. 4th DCA 2004); *see also Robinson v. Linzer*, 758 So.2d 1163, 1164 (Fla. 4th DCA 2000) (noting that inconsistent contractual terms create issue of fact as to agency relationship). Moreover, Florida courts have held that "the privilege to interfere afforded to an agent who . . . gives 'honest advice' that it is in his principal's best interest to breach an existing relationship" is not available where the agent acts solely with ulterior purposes and the advice is not in the principal's best interest. *See Scussel v. Balter*, 505 So. 2d 122, 1228 (Fla. 3d DCA 1980); *see also Sloan*, 505 So. 2d at 528; *Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092, 1095-1096 (Fla. 1st DCA 1999), *rev. denied*, 744 So.2d 453 (Fla.1999).[13] Accordingly, material issues of fact remain as to whether an agency relationship existed between Tetra Tech and the City, and, if so, whether Tetra Tech was divested of its privilege to interfere due to ulterior purposes.

  B. Count VI - Professional Negligence against William McConnell

In Count VI of the Amended Complaint, Poole and Kent asserts a claim of professional negligence against McConnell. In his Motion, McConnell argues that he is entitled to summary judgment because he did not render professional services on the project, and therefore did not owe a duty to Poole and Kent to exercise due care in

---

[13] Although this line of cases involves facts concerning employer-employee agency relationships, the cases suggest that Florida courts would find that a privilege defense based on agency status brought under the instant facts is similarly limited.

performing any such services.

Under Florida law, professionals are held responsible for their negligent acts. *See Indemnity Ins. Co. of North America v. American Aviation, Inc.*, 344 F.3d 1136, 1137 (11th Cir. 2003) (internal citation omitted); *see also Moransais v. Heathman*, 744 So.2d 973, 983 (Fla. 1999) ("[T]he mere existence of a contract between the professional services corporation and a consumer does not eliminate the professional obligation of the professional who actually renders the service to the consumer or the common law action that a consumer may have against the professional provider."). Moreover, "where the negligent party is a professional, the law imposes a duty to perform the requested services in accordance with the standard of care used by similar professionals in the community under similar circumstances." *See Lochrane Engineering, Inc. v. Willingham Realgrowth Inv. Fund, Ltd.*, 552 So.2d 228, 232 (Fla. 5th DCA 1989). As the Court in *Moransais v. Heathman*, 744 So.2d 973 (Fla. 1999) noted, engineers have been held liable for failure to exercise due care in rendering professional services. *See, e.g., Luciani v. High*, 372 So.2d 530 (Fla. 4th DCA 1979) (involving suit against engineer based on negligently performed tests resulting in economic loss to plaintiff's property). Under Florida Statute Section 471.005(7), "engineering" is defined as:

> "[A]ny service or creative work, the adequate performance of which requires engineering education, training, and experience in the application of special knowledge of the mathematical, physical, and engineering sciences to such services or creative work as consultation, investigation, evaluation, planning, and design of engineering works and systems, planning the use of land and water, teaching of the principles and methods of engineering design, engineering surveys, and the inspection of construction for the purpose of determining in general if the work is proceeding in compliance with drawings and specifications, any of which embraces such services or work, either

15

public or private, in connection with any utilities, structures, buildings, machines, equipment, processes, work systems, projects, and industrial or consumer products or equipment of a mechanical, electrical, hydraulic, pneumatic, or thermal nature, insofar as they involve safeguarding life, health, or property; and includes such other professional services as may be necessary to the planning, progress, and completion of any engineering services. *A person who practices any branch of engineering; who, by verbal claim, sign, advertisement, letterhead, or card, or in any other way, represents himself or herself to be an engineer or, through the use of some other title, implies that he or she is an engineer or that he or she is licensed under this chapter; or who holds himself or herself out as able to perform, or does perform, any engineering service or work or any other service designated by the practitioner which is recognized as engineering shall be construed to practice or offer to practice engineering within the meaning and intent of this chapter.*

Fla. Stat. § 471.005(7) (emphasis added).[14]

McConnell argues that he did not engage in the practice of engineering because he merely acted as a "negotiator and claims consultant" on the Project. [DE 136, 1-2]. In response, Poole and Kent points to evidence demonstrating that McConnell drafted certain Change Order Work Directives and Noncompliance Directives in connection with the Project. [DE 162-4, 162-5]. Moreover, Poole and Kent cites evidence indicating that McConnell researched pricing for the project and noted potential design changes. [DE 162-7]. Poole and Kent further argues that McConnell engaged in the practice of engineering when he held himself out as a professional engineer on Tetra Tech's

---

[14] Although the parties do not address Florida's economic loss rule, it bears mentioning that in *Moransais*, the Florida Supreme Court considered the question of whether the economic loss doctrine barred a negligence action to recover purely economic loss in a case where the defendant was neither a manufacturer nor distributor of a product *and there was no privity of contract. See Moransais*, 744 So.2d 973. In answering this question, the court held "that the economic loss rule does not bar a cause of action against a professional for his or her negligence even though the damages are purely economic in nature and the aggrieved party has entered into a contract with the professional's employer." *Id.* at 983-84.

16

letterhead, even though it was revealed during discovery that he was not licensed in Florida. Specifically, Poole and Kent points to evidence demonstrating that on January 24, 2006, McConnell wrote to Poole and Kent on the subject of "Field Orders" on Tetra Tech letterhead and signed the letter on behalf of Tetra Tech as a "P.E." [DE 163-2]. Likewise, on May 5, 2006, McConnell wrote to Poole and Kent on Tetra Tech letterhead and again signed the letter on behalf of Tetra Tech as a "P.E." [DE 163-3]. Based on this evidence, the full extent of McConnell's role on the Project cannot be determined as a matter of law. Accordingly, construing the facts in the light most favorable to Poole and Kent, I conclude that there are material issues of fact as to whether McConnell practiced professional engineering on the Project, thereby subjecting him to liability for breach of the duty to perform professional services in accordance with the applicable standard of care.

## IV. Conclusion

In light of the foregoing, I conclude that issues of unresolved fact remain precluding summary judgment in favor of Defendants Tetra Tech and McConnell. Accordingly, it is hereby

ORDERED AND ADJUDGED that

1. Defendants' Motions for Summary Judgment **[DE 95 & 134]** are **DENIED**.
2. Tetra Tech's Motions to Strike the Declarations of Patrick H. Carr and Brian McCluggage **[DE 148, 149]** are **DENIED WITHOUT PREJUDICE.**

DONE and ORDERED in Chambers in Miami, Florida, this 2nd day of September, 2010.

THE HONORABLE ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

cc:
All counsel of record
U.S. Magistrate Judge Chris M. McAliley

17